IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| Peter M. Johnson, | : | |
| | : | |
| Plaintiff, | : | Case No.: 2:16-cv-00670 |
| | : | |
| v. | : | Judge Edmund A. Sargus, Jr. |
| | : | |
| Edison Media Research, Inc., | : | Magistrate Judge Terence P. Kemp |
| | : | |
| Defendant. | : | |

PLAINTIFF'S MEMORANDUM OPPOSING DEFENDANT'S
MOTION TO DISMISS (ECF NO. 4)

I. STATEMENT OF THE CASE

On July 11, 2016, plaintiff Peter M. Johnson filed this action for injunctive and declaratory relief against defendant Edison Media Research, Inc. (hereinafter "EMR") under 42 U.S.C. §1983. In his Complaint (ECF No. 2), the plaintiff asserted that the defendant violated his constitutional rights under color of state law.

More specifically, plaintiff is a United States citizen residing in the City of Columbus, County of Franklin, and State of Ohio. At all times material hereto, plaintiff was and is a registered voter, as shown in the records of the Franklin County (Ohio) Board of Elections, and was eligible to vote in the 2016 Ohio Presidential Primary Election held on March 15, 2016. Complaint (ECF No. 2), ¶5. EMR is a New Jersey corporation that conducted "exit polls" in this judicial district and elsewhere in the State of Ohio during the Presidential Primary Elections held in the State of Ohio on March 15, 2016. EMR also conducted "exit polls" in Alabama, Arkansas, Georgia, Massachusetts, Oklahoma, Tennessee, Texas, New Hampshire, Vermont, Virginia, South Carolina, Wisconsin, New York, Indiana, Florida, Illinois, Missouri, North Carolina, Connecticut,

Maryland, Pennsylvania, Nebraska, and West Virginia during their respective Presidential Primary Elections held in 2016. Complaint (ECF No. 2), ¶6.

On March 15, 2016, Democratic Presidential Primary and Republican Presidential Primary Elections were held in the State of Ohio to select their respective candidates for the Presidential General Election on November 8, 2016. Plaintiff voted in the Democratic Presidential Primary Election held in the State of Ohio on March 15, 2016. In this election, plaintiff voted at the polling place for his precinct in Columbus, Ohio. Complaint (ECF No. 2), ¶¶7-8.

During the Presidential Primary Elections held in the State of Ohio on March 15, 2016, defendant EMR conducted "exit polls" of voters at a sample of polling places selected by EMR in this judicial district and elsewhere in the State of Ohio. EMR intended its sample of precincts to collectively represent the State of Ohio as a whole. Complaint (ECF No. 2), ¶9.

EMR conducted such "exit polls" by interviewing voters, after they voted, at the polling places selected by EMR in this judicial district and elsewhere in the State of Ohio. EMR interviewers, at each precinct, selected voters exiting the polling place and gave them questionnaires to complete. Each questionnaire asked the voter who he/she voted for; asked the voter about issues affecting his/her vote choice; and asked about the voter's demographics including gender, age, and race. The voter's participation was voluntary and anonymous. Interviewing started when the polls opened and continued throughout the day until one (1) hour before the polls closed. Complaint (ECF No. 2), ¶10.

In describing itself, EMR says that:

> Edison Research is the exclusive provider of election exit polls to the National Election Pool consisting of ABC, CBS, CNN, FOX, NBC and the Associated Press and we are currently preparing for our coverage of the 2016 U.S. Presidential Primaries and Caucuses. Edison will be conducting exit polls for most competitive primaries and caucuses for both the Democratic and Republican Parties.

> Our 2016 voter surveys will provide political, demographic and geographic information detailing voter preferences for President. In addition to the 2016 General Election, we will also be covering a number of primaries and caucuses . . .
>
> Exit Polls tell us:
>
> - WHO voted for each candidate
> - WHY voters in your area made critical choices
> - WHERE geographical differences on candidates and issues were a factor.
>
> Edison Research currently conducts all exit polls and provides election projections and analysis for the news organizations that comprise the National Election Pool (NEP) – ABC, CBS, CNN, Fox, NBC and the Associated Press. Edison will again be the exclusive providers of exit polling data for the 2016 primaries and general elections. For more information on subscribing to the 2016 NEP Exit Poll, click here.
>
> Edison also provides this data to many international, national and local news outlets to enhance their election coverage. Clients include the New York Times, the Washington Post, the Wall Street Journal, the Los Angeles Times, USA Today, Newsweek, the Chicago Tribune, the Atlanta Journal-Constitution, the Boston Globe, the Detroit Free Press, the Denver Post, the Miami Herald, the Milwaukee Journal Sentinel, Newsday, the Sacramento Bee, the Star Ledger, the St. Louis Post, the St. Petersburg Times, NY1 News and National Public Radio.
>
> Exit poll data is one of the key methods of understanding the results of an election and Edison Research is proud to be the exclusive provider of this important information to news organizations around the country and around the world.[1]

The results of the "exit polls" that EMR conducted on March 15, 2016 during the Presidential Primary Elections in the State of Ohio *did not match the actual election outcomes when the votes were counted.* Complaint (ECF No. 2), ¶11.

EMR admits that it publicly distributes "exit poll" data, and says that:

---

[1] http://www.edisonresearch.com/election-polling/#toggle-id-1

> It is our goal to make data available to subscribers with speed, clarity and, most importantly, accuracy. The information is delivered through a secure web application on Election Day.
>
> **What You Get:**
>
> - Statewide crosstab reports, beginning in the late afternoon and updated throughout election night
> - Detailed demographics, including age, gender, income, education, employment, and other key factors
> - Voter responses to current issue and candidate quality questions
> - Printer-friendly PDF of exit poll results
> - Horizontal and vertical crosstab format views of data
> - Live chat via telephone or messenger system with your subscriber contact
> - Projected results at poll closing for races with clear outcomes
> - For races without clear outcomes, communication is provided throughout election night and notification when a projection will be made[2]

EMR provides the Ohio Secretary of State with adjusted results from its "exit polls" conducted in this judicial district and elsewhere in the State of Ohio. Complaint (ECF No. 2), ¶15.

The Ohio Secretary of State regularly provides EMR with detailed records of voter demographics and actual election outcomes after the votes are counted, and allows EMR to conduct "exit polls" near polling places. Also, the Ohio Secretary of State provided EMR with detailed records of voter demographics and actual election outcomes after the votes were counted in the Presidential Primary Elections held in the State of Ohio on March 15, 2016. After the Ohio Secretary of State provided EMR with those voter demographics and actual election outcomes, ***EMR adjusted the results of its "exit polls" to match them.*** Complaint (ECF No. 2), ¶¶12-14.

---

[2] http://www.edisonresearch.com/election-polling/#toggle-id-3

Plaintiff contends that "exit polls" are speech protected by the First Amendment to the United States Constitution because: (a) the information gathered and disseminated in "exit polls" goes to the heart of the democratic process, (b) the process of obtaining the information in "exit polls" requires a significant discussion between pollster and voter, and (c) "exit polls" provide a valued source of reliable data about voter behavior. EMR refuses to provide the plaintiff and people like him with access to its unadjusted "exit poll" results because they do not pay subscription fees to EMR. The Ohio Secretary of State is aware that EMR refuses to provide the plaintiff and people like him with access to its unadjusted "exit poll" results because they do not pay subscription fees to EMR. Complaint (ECF No. 2), ¶¶22-24.

Plaintiff also contends that, for the reasons stated above, there is a close nexus between EMR and the Ohio Secretary of State, such that EMR's conduct may fairly be treated as action under color of state law. Moreover, the refusal of EMR to provide the plaintiff and people like him with access to its unadjusted "exit poll" results, because they do not pay subscription fees to EMR, unreasonably obstructs, impedes, and interferes with the free exercise of protected speech. Complaint (ECF No. 2), ¶¶25-26.

Accordingly, the refusal of EMR to provide the plaintiff and people like him with access to its unadjusted "exit poll" results, because they do not pay subscription fees to EMR, is state action that violates plaintiff's rights under the First Amendment to the United States Constitution, applied to EMR through the Due Process Clause of the Fourteenth Amendment to the United States Constitution. The refusal of EMR to provide the plaintiff and people like him with access to its unadjusted "exit poll" results, because they do not pay subscription fees to EMR, is state action that violates 42 U.S.C. §1983. Complaint (ECF No. 2), ¶¶27-28.

On September 12, 2016, EMR moved for "an order dismissing plaintiff's claims with prejudice." EMR invoked Fed. R. Civ. P. 12(b)(6) for its motion. EMR Motion to Dismiss (ECF No. 4), p. 1.

## II. ARGUMENT

A.  THE DEFENDANT'S RULE 12(b)(6) MOTION FOR AN ORDER DISMISSING PLAINTIFF'S CLAIMS WITH PREJUDICE LACKS MERIT AND SHOULD BE DENIED.

1.  <u>A Rule 12(b)(6) Motion Should Not Be Granted If The Complaint Contains Direct Or Inferential Allegations That Support A Viable Legal Theory.</u>

A motion to dismiss a civil rights complaint under Rule 12(b)(6) is scrutinized with special care. <u>Kent v. Johnson</u>, 821 F.2d 1220, 1223 (6th Cir. 1987). Such a complaint "need not set down in detail ***all*** the particularities of a plaintiff's claim". <u>Westlake v. Lucas</u>, 537 F.2d 857, 858 (6th Cir. 1976) (emphasis added). The complaint must allege "enough facts to state a claim to relief that is plausible on its face." <u>Bell Atlantic Corp. v. Twombly</u>, 550 U.S. 544, 570, 127 S.Ct. 1955, 1965 (2007). A "plausible" claim states facts that, "if accepted as true, are sufficient to raise a right to relief above the speculative level." <u>Handy–Clay v. City of Memphis</u>, 695 F.3d 531, 538 (6th Cir. 2012). The plausibility standard "is not akin to a 'probability requirement', but it asks for more than a sheer possibility that a defendant has acted unlawfully." <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 678, 129 S.Ct. 1937, 1949 (2009).

The court is required to "construe the complaint in the light most favorable to the plaintiff, accept its allegations as true, and draw all reasonable inferences in favor of the plaintiff." <u>Directv, Inc. v. Treesh</u>, 487 F.3d 471, 476 (6th Cir. 2007). The plaintiff's complaint "must contain either direct or inferential allegations with respect to all material elements necessary to sustain a recovery

under some viable legal theory." Weisbarth v. Geauga Park Dist., 499 F.3d 538, 541 (6th Cir. 2007).

Pleading conclusory allegations is permitted if they include specific facts to support the cause of action. See New Albany Tractor, Inc. v. Louisville Tractor, Inc., 650 F.3d 1046, 1050 (6th Cir. 2011). As one court has said, "the happenstance that a complaint is 'conclusory', whatever exactly that overused lawyers' cliché means, does not automatically condemn it." Brownlee v. Conine, 957 F.2d 353, 354 (7th Cir. 1992).

In the present case, the plaintiff has stated claims for relief that survive EMR's motion to dismiss. First, the plaintiff has pleaded specific facts showing that EMR is a state actor. Second, EMR has violated the First Amendment by impeding plaintiff's right to access data that EMR obtained through public processes. Third, EMR is a willing speaker, which gives the plaintiff standing to litigate EMR's violation of his First Amendment right to receive such information.

2. Edison Media Research Is A State Actor As Contemplated By 42 U.S.C. §1983.

To state a claim under §1983, plaintiffs "must demonstrate that the defendant deprived them of their 'rights, privileges, or immunities secured by the Constitution' under color of state law." Lindsey v. Detroit Entm't, LLC, 484 F.3d 824, 827 (6th Cir. 2007). A private party is subject to suit under §1983 if "the alleged infringement of federal rights [is] fairly attributable to the State." Rendell-Baker v. Kohn, 457 U.S. 830, 838, 102 S.Ct. 2764, 2770 (1982). The Supreme Court set forth three tests to determine whether the challenged conduct may be fairly attributable to the state. One is the symbiotic relationship or nexus test. Burton v. Wilmington Parking Auth., 365 U.S. 715, 721-26, 81 S.Ct. 856, 859-862 (1961). This test is met where there is a "sufficiently

close nexus between the government and the private party's conduct". Norris v. Premier Integrity Solutions, Inc., 641 F.3d 695, 698 (6th Cir. 2011).

There is no readily applicable formula for finding such a close nexus. Divining such a close relationship can only be accomplished "in the framework of the peculiar facts or circumstances present." Wilcher v. City of Akron, 498 F.3d 516, 520 (6th Cir. 2007). However, "[t]he nexus can be established with evidence of a customary or preexisting arrangement between the government and the private actor." Durante v. Fairlane Town Center, 201 Fed.Appx. 338, 344 (6th Cir. 2006). A sufficiently close relationship between the state and the private actor may also be established through state regulation. Ellison v. Garbarino, 48 F.3d 192, 195 (6th Cir. 1995). Finally, there are occasions where unanswered questions may present issues of fact "regarding the proper characterizations of the actions" that only a trial can decide. Chapman v. Higbee Co., 319 F.3d 825, 834 (6th Cir. 2003) (en banc).

EMR's "exit polling" in Ohio is state regulated. This is because EMR conducts "exit polls" near polling places as allowed by the Ohio Secretary of State. Complaint (ECF No. 2), ¶12.

EMR also has customary or preexisting arrangements with the Ohio Secretary of State, who regularly provides EMR with detailed records of voter demographics and actual election outcomes after the votes are counted. The Ohio Secretary of State provided EMR with detailed records of voter demographics and actual election outcomes after the votes were counted in the Presidential Primary Elections held in the State of Ohio on March 15, 2016. After the Ohio Secretary of State provided EMR with those voter demographics and actual election outcomes, EMR adjusted the results of its "exit polls" to match them. EMR regularly provides the Ohio Secretary of State with adjusted results from its "exit polls" conducted in this judicial district and elsewhere in the State of Ohio. Complaint (ECF No. 2), ¶¶13-15. The Ohio Secretary of State is

aware of, and acquiesces in, EMR's refusal to allow the plaintiff access to its unadjusted "exit poll" results. Complaint (ECF No. 2), ¶¶23-24.

By pleading these facts, the plaintiff has shown that a sufficiently close relationship exists between EMR and the Ohio Secretary of State through regulation, and through customary or preexisting arrangements, to create a symbiotic relationship or nexus. EMR is therefore a state actor under §1983.

3. Edison Media Research Violated The Plaintiff's First Amendment Right Of Access To Its Unadjusted "Exit Poll" Data.

   a. The Plaintiff Does Not Claim That EMR Is A News Organization With A "Constitutional Duty To Publish", Or That EMR Is A Private Actor Who Can Be Compelled To Publish.

EMR cites Miami Herald v. Tornillo, 418 U.S. 241, 94 S.Ct. 2831 (1974) for the proposition that "news organizations cannot be compelled to publish." EMR Motion to Dismiss (ECF No. 4), p. 9. Tornillo actually held that the First Amendment bars a State from requiring a newspaper to print the reply of a candidate for public office whose personal character has been criticized by that newspaper's editorials. Id. at 256-258, 94 S.Ct at 2838-2839. This is not the issue here. In its comprehensive self-description, EMR does not claim to be a newspaper or a news organization. See pp. 2-3, infra. In his complaint, the plaintiff does not assert that EMR is a news outlet.

EMR argues that "a private actor cannot be compelled to publish", citing McIntyre v. Ohio Elections Comm'n, 514 U.S. 334, 115 S.Ct. 1511 (1995). McIntyre actually held that the First Amendment bars a State from requiring a political pamphleteer to include the name and address of the author in his pamphlet. Id. at 357, 115 S.Ct. at 1524. This is also not the issue here. By its

own admission, EMR is a prolific publisher of "exit poll" data. See p. 4, <u>infra</u>. In his complaint, the plaintiff seeks access to EMR's existing unadjusted "exit poll" data, not publication.

The plaintiff does not argue that EMR has a "constitutional duty to publish", or that EMR is a private actor who can be compelled to publish. These are "red herrings" offered up by EMR. The plaintiff contends that EMR is a state actor under §1983, and that he has a First Amendment right of access to EMR's unadjusted poll data.

    b. <u>The First Amendment Grants A Right Of Access To Edison Media Research's Unadjusted "Exit Poll" Data.</u>

Exit polling is protected speech under the First Amendment, "not only in that the information disseminated based on the polls is speech, but also in that the process of obtaining the information requires a discussion between pollster and voter." <u>The Daily Herald Co. v. Munro</u>, 838 F.2d 380, 384 (9th Cir.1988). This is because "the ability to speak on matters of public importance is fundamental to self-government." <u>CBS Inc. v. Smith</u>, 681 F.Supp. 794, 803 (S.D. Fla. 1988).

Under the First Amendment, "the public has a right to every man's views". <u>American Communications Ass'n v. Douds</u>, 339 U.S. 382, 395, 70 S.Ct. 674, 682 (1950). That right exists because "[t]he political system of the United States is dependent upon the virtually unfettered exchange of expressions and opinions." <u>Good v. Roy</u>, 459 F. Supp. 403, 406 (D. Kan. 1978).

Thus, a major purpose of the First Amendment is "to protect the free discussion of governmental affairs". <u>Mills v. Alabama</u>, 384 U.S. 214, 218, 86 S.Ct. 1434, 1437 (1966). It is critical to this purpose that "[f]alsehoods and fallacies must be exposed, not suppressed". <u>American Communications</u>, 339 U.S. at 396, 70 S.Ct. at 683.

The First Amendment "goes beyond protection of the press and the self-expression of individuals *to prohibit government from limiting the stock of information from which members of the public may draw*." First Nat'l Bank of Boston v. Bellotti, 435 U. S. 765, 783, 98 S.Ct. 1407, 1420 (1978) (emphasis added). This has been called a "right of access" or a "right to gather information". Richmond Newspapers, Inc. v. Virginia, 448 U.S. 555, 576, 100 S.Ct. 2814, 2827 (1980). As the Sixth Circuit has observed:

> 'The dominant purpose of the First Amendment was to prohibit the widespread practice of governmental suppression of embarrassing information.' It would be ironic, indeed, to allow the Government's assertion of plenary power to transform the First Amendment from the great instrument of open democracy to a safe harbor from public scrutiny. In the words of Justice Murphy, '[such a] conclusion would make our constitutional safeguards transitory and discriminatory in nature. . . . [We] cannot agree that the framers of the Constitution meant to make such an empty mockery of human freedom.'

Detroit Free Press v. Ashcroft, 303 F.3d 681, 686 (6th Cir. 2002) (citations omitted).

Whether a plaintiff can invoke the First Amendment right of access is decided by a two-part "experience and logic" test that is satisfied when: (1) there is a tradition of public entree to particular proceedings or information, and (2) access to a particular government process is important to that very process. Richmond Newspapers at 589, 100 S.Ct. at 2834. According to the Sixth Circuit, this is a test of "general applicability". Detroit Free Press, 303 F.3d at 694-696.

Areas in the vicinity of polling places "are traditional public forums because they traditionally are open to the public for expressive purposes, including random interviews by reporters". Daily Herald, 838 F.2d at 384-85. Participating in an exit poll is speaking on matters of public importance that are fundamental to self-government. American Broadcasting Cos., Inc. v. Wells, 669 F.Supp.2d 483, 487 (D.N.J. 2009). Therefore, exit polling satisfies the "experience and logic" test for invoking the First Amendment right of access.

EMR may contend that Houchins v. KQED, Inc., 438 U.S. 1, 98 S.Ct. 2588 (1978), and its progeny govern this case. EMR may also argue that Houchins held "[n]either the First Amendment nor the Fourteenth Amendment mandates a right of access to government information or sources of information within the government's control." Id. at 15-16, 98 S.Ct. at 2597. However, the Sixth Circuit has distinguished Houchins away for us, by observing that:

> The issue before the Court in *Houchins,* decided two years before *Richmond Newspapers,* was 'whether the news media have a constitutional right of access to a county jail, *over and above that of other persons,* to interview inmates and make sound recordings, films and photographs for publication and broadcasting by newspapers, radio and television' . . .
>
> Next, *Houchins* rested its holding on the Court's interpretation of the press clause, a First Amendment clause distinct from the speech clause, which is here at issue. Moreover, . . . *Houchins* represented a plurality opinion of the Court, and as such, ***the conclusion that the First and Fourteenth Amendments do not guarantee the public a right of access to information generated or controlled by the government was neither accepted nor rejected by a majority of the Court.*** Additionally, . . . we question the vitality of the standard articulated in *Houchins* . . . [I]n repeatedly applying *Richmond Newspapers's* two-part 'experience and logic' test to assess the merits of cases claiming First Amendment access rights . . . it is clear that the Court has since moved away from its position in *Houchins* . . .

Detroit Free Press, 303 F.3d at 694-695 (citations omitted and emphasis added).

On March 15, 2016, EMR conducted "exit polls" of voters at a sample of polling places selected by EMR in this judicial district and elsewhere in the State of Ohio. Complaint (ECF No. 2), ¶9. EMR conducted such "exit polls" by interviewing voters, after they voted, about who he/she voted for, and about issues affecting his/her vote choice. Complaint (ECF No. 2), ¶10. The information gathered and disseminated in "exit polls" goes to the heart of the democratic process, the process of obtaining the information in "exit polls" requires a significant discussion between pollster and voter, and "exit polls" provide a valued source of data about voter behavior.

[12]

Complaint (ECF No. 2), ¶22. The "exit polls" were taken near the polling places where voters cast their ballots. Complaint (ECF No. 2), ¶10. By pleading these facts, the plaintiff satisfied the two-part "experience and logic" test for invoking a First Amendment right of access. See p. 11, infra.

        a.    Article III Of The United States Constitution Grants The Plaintiff Standing To Sue Edison Media Research.

Article III of the United States Constitution limits the jurisdiction of federal courts to "Cases" and "Controversies", and "[t]he doctrine of standing gives meaning to these constitutional limits by 'identify[ing] those disputes which are appropriately resolved through the judicial process'." Susan B. Anthony List v. Driehaus, –U.S.–, 134 S.Ct. 2334, 2341 (2014) (quoting Lujan v. Defenders of Wildlife, 504 U.S. 555, 560, 112 S.Ct. 2130, 2136 (1992)). The irreducible constitutional minimum of standing consists of three elements. A plaintiff "must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of a defendant, and (3) is likely to be redressed by a favorable judicial decision." Spokeo, Inc. v. Robins, –U.S.–, 136 S. Ct. 1540, 1547 (2016) (quoting Lujan, 504 U.S. at 560, 112 S.Ct. at 2136). However, the standing requirement is relaxed in First Amendment cases. American Broadcasting Co., Inc. v. Blackwell, 479 F.Supp.2d 719, 728 (S.D. Ohio 2006) (Watson, J.).

To demonstrate injury-in-fact, the plaintiff must show an invasion of a legally protected interest which is concrete and particularized, and actual or imminent, not conjectural or hypothetical. Friends of the Earth, Inc. v. Laidlaw Environmental Servs (TOC), Inc., 528 U.S. 167, 180, 120 S.Ct. 693, 704 (2000). To demonstrate traceability, the plaintiff must show a causal connection between the injury and the defendant's conduct, not the result an independent action of some third party. Simon v. Eastern Ky. Welfare Rights Organization, 426 U.S. 26, 41-42, 96 S.Ct. 1917, 1926 (1976). To demonstrate likelihood, the plaintiff must show it is more than merely

speculative that the injury will be redressed by a favorable decision. Id. at 38-43, 96 S.Ct. at 1924-1926.

EMR contends that the plaintiff lacks standing. It argues that "[w]ithout a willing speaker, plaintiff cannot show he suffered any injury from a restriction on his receipt of information". EMR Motion to Dismiss (ECF No. 4), p. 11. The concept of "willing speaker" pertains to a First Amendment right-to-receive claim. Bond v. Utreras, 585 F.3d 1061, 1078 (7th Cir. 2009). The right to receive information from a willing speaker is not the same as the right of access to gather information in the defendant's possession. See United States v. Miami Univ., 91 F.Supp.2d 1132, 1154-1158 (S.D. Ohio 2000) (Smith, J.).

Even if EMR's standing argument is correct, EMR is clearly a willing speaker. EMR publicly boasts that:

> It is our goal to make [exit poll] data available to subscribers with speed, clarity and, most importantly, accuracy. The information is delivered through a secure web application on Election Day.

See p. 4, infra.

EMR next argues that "[p]laintiff's right to obtain information is not as broad as the right of free speech from which it stems", citing Martin v. U.S. E.P.A., 271 F.Supp.2d 38 (D.D.C. 2002). EMR Motion to Dismiss (ECF No. 4), p. 11. EMR miscites Martin, which actually held that "[t]he right to *receive* information is not as broad as the right of free speech from which it stems." Id. at 48 (quoting Student Press Law Ctr. v. Alexander, 778 F.Supp. 1227, 1233 (D.D.C.1991)) (emphasis added). Again, the right to receive information is not the same as the right of access to gather information.

The plaintiff satisfies all the elements of standing in the present case. First, he has an actual, concrete, and particularized injury-in-fact from EMR's invasion of a legally protected

[14]

interest. The plaintiff has a First Amendment right of access to gather: (a) information about how "exit poll" data is gathered, (b) information about how "exit poll" data is analyzed and disseminated, and (c) information about the reliability of "exit poll" data. This is because he has a right to the views of others, he has a right to the free discussion of governmental affairs, and he has a right to uncover falsehoods and fallacies affecting political discourse.

On March 15, 2006, EMR conducted "exit polls" by interviewing voters, after they voted, at Ohio polling places it selected. Complaint (ECF No. 2), ¶10. EMR intended its sample of precincts to collectively represent the State of Ohio as a whole. Complaint (ECF No. 2), ¶9. The results of the "exit polls" that EMR conducted in the State of Ohio did not match the actual election outcomes when the votes were counted. Complaint (ECF No. 2), ¶11. The Ohio Secretary of State provided EMR with detailed records of voter demographics and actual election outcomes after the votes were counted. Using that information, EMR adjusted the results of its "exit polls" to match. Complaint (ECF No. 2), ¶¶12-14. The plaintiff has a First Amendment right of access, as described above, to gather information about this process—including the unadjusted "exit poll" results. EMR, a state actor, invaded the plaintiff's First Amendment rights by refusing him access to its unadjusted "exit poll" results.

Second, there is a causal connection between the plaintiff's injury and EMR's conduct. EMR, not a third party, denied the plaintiff's First Amendment right of access by refusing him its unadjusted "exit poll" results.

Third, it is not speculative that plaintiff's injury will be redressed by a favorable decision. The plaintiff has asked for a mandatory injunction compelling EMR to allow him access to its unadjusted "exit poll" results. This relief will vindicate plaintiff's First Amendment right of access.

B.  EDISON MEDIA RESEARCH HAS MADE A FRIVOLOUS DEMAND FOR SANCTIONS THAT IS ITSELF PUNISHABLE BY SANCTIONS.

A court may impose sanctions if a party's pleadings or claims are presented for an improper purpose, are not warranted by existing law or a non-frivolous extension of the law, or if the allegations and factual contentions do not have evidentiary support. First Bank of Marietta v. Hartford Underwriters, 307 F.3d 501, 526 (6th Cir. 2002). The test is whether those pleadings or claims were reasonable under the circumstances. Ridder v. City of Springfield, 109 F.3d 288, 293 (6th Cir. 1997). In the present case, plaintiff's pleadings and claims were reasonably presented for a proper purpose, warranted by existing law, and were supported by facts asserted in the complaint. See pp. 1-15, infra.

Moreover, the Sixth Circuit recognizes a 21-day "safe harbor" period during which the offending party can avoid sanctions altogether by withdrawing the challenged document after receiving a formal request from his opponent. Ridder, 109 F.3d at 294. EMR has not submitted any proof with its motion that it sent the plaintiff a "safe harbor" request.[3]

A frivolous demand for sanctions is itself punishable by sanctions. Naegele v. Albers, 355 F. Supp. 2d 129, 144 (D.D.C. 2005). EMR demands that this Court "award Edison its attorneys' fees and expenses incurred herein". EMR Motion to Dismiss (ECF No. 4), p. 12. Without first sending the plaintiff a "safe harbor" request, EMR's demand for sanctions is frivolous. Its demand for sanctions is also frivolous because plaintiff's pleadings and claims are reasonable. Accordingly, this Court should sanction EMR for asserting these frivolous claims.

---

[3] EMR cannot do so because it did not send the plaintiff a "safe harbor" request.

[16]

III. CONCLUSION

For the foregoing reasons, plaintiff Peter M. Johnson requests that this Court deny the defendant's motion for "an order dismissing plaintiff's claims with prejudice", and award him attorney's fees and expenses incurred herein.

Respectfully submitted,

*/s/ Robert J. Fitrakis*

ROBERT J. FITRAKIS
Ohio Sup. Ct. Reg. No. 0076796
Fitrakis & Gadell-Newton, LLC
1021 East Broad Street
Columbus, OH 43205
Phone: (614) 307-9783
Fax: (614) 929-3513
E-Mail: fgnlegal@gmail.com
*Counsel for Plaintiff*

CERTIFICATE OF SERVICE

I hereby certify that a true copy of the foregoing was sent on September 20, 2016 by electronic mail to Michael K. Farrell, Esq., mfarrell@bakerlaw.com, 127 Public Square, Suite 2000, Cleveland, OH 44114, attorney for defendant Edison Media Research, Inc.

*/s/ Robert J. Fitrakis*

ROBERT J. FITRAKIS
*Counsel for Plaintiff*